Court of Appeals for the Third Circuit are admonished to draw near and give their attention. The discord is now in session. God save the United States and this honorable court. Please be seated. Thank you. Good morning, everyone. We are ready to proceed on our first case. But first, I'd like to, Judge Fischer and I would like to thank Paul Diamond once again of the Eastern District of Pennsylvania for helping us out this morning. Thank you, Judge Diamond. First case on the docket is Azur. Is it Azur? Azur. Azur. Azur VChase. Good morning, Your Honors. I'm pleased to support. My name is Jerry Ryan of the law firm of Dorf Reed and Armstrong, counsel for appellant Francis H. Azur. This case involves an attempt by a cardholder to recover damages caused by Chase's negligent maintenance of an account opened in his name. Over a series of six years, a identity theft thief was able to essentially embezzle over $1 million from Mr. Azur by using a Chase credit card opened to his name and filtering money from his checking account through Chase and then into her pocket. At the district court level, the district court granted judgment in favor of Chase on all of the counts, which included a claim under 1643 under the Truth in Lending Act, as well as section 1666 under the Fair Credit Billing Act, the subpart of TILA, as well as a negligence claim. Initially, when the magistrate judge issued his report and recommendation, he recommended that only the 1666 claim and the negligence claim be dismissed and that the 1634 claim, 43 claim, excuse me, proceed because there was a disputed issue as to whether or not the embezzler, Michelle Vannick, actually had apparent authority. How do you have a claim under 1666? If that statute essentially is a limitation of liability of the cardholder statute, in other words, is there really a separate and distinct cause of action that you can claim under 1643? Does Your Honor mean 1643? Did I misspeak? 1643. Yes. Yes. Actually, the Seventh Circuit just looked at that case in the matter of Asher and noted that there certainly is an affirmative claim under 1643 and that the majority of circuits that there is an affirmative claim? That there is. Can you point to the language that allows you to present an affirmative claim? Sure. And in support of its conclusion, the court said that it's clear because Congress included a statute of limitation provision in section 1643 and why would they do that if there was not an affirmative claim provided for under 1643? And I am reading from section 2.A of that. Ms. Ryan, would you pull that microphone up just a little bit? I think it's not picking up here. Sorry. The court, and I'm quoting, although the Truth in Lending Act does not state explicitly that a cardholder can bring a suit claiming a violation of 15 U.S.C. Are you reading from the statute or are you reading from the opinion? From the opinion. How about from the statute? The statute says that the cardholder's liability is limited to $50 when the charges are unauthorized. In order to enforce the meaning of that statute, you would have to allow for a claim by the cardholder against the card issuer. If you didn't, then there's no way of limiting the liability to $50. Isn't that statute essentially an aid of cardholders where there is, for example, fraudulent use of a credit card and the issuer goes after the cardholder? The cardholder can then say, I gave you notice and my liability is limited to $50. That is certainly one of the purposes of the statute. And that's certainly part of the claim here with Mr. Azar. There are outstanding charges that have not been paid on his account and Chase is claiming that those are owed by him and they are on his credit report. So that is one leg of his claim. The other leg certainly is reimbursement for the costs that are already paid. But in this situation where the identity thief is able to access both a credit card opened in his name as well as his checking account, the payments had been made. A similar circumstance. Let me go back to the original question. What language in 1643 establishes a cause of action? And again, I would have to rely on the same language that the Seventh Circuit did, that the limitation of liability of $50 as well as the one-year statute of limitation certainly implies, if not explicitly states, that there is an affirmative cause of action. All right. How do you get around our decision in Sovereign Bank? Sure. One of the things that I would argue is that that case is certainly distinguishable from the facts of this case. Sovereign Bank did not involve a cardholder. It involved a claim by a card issuer against an inquiring bank attempting to assert an equitable identification claim. I'm quite aware that this court stated that it did not believe that there was an affirmative claim under 1643 in that case. However, I don't think that was necessary for the court to do to come to its ultimate holding in Sovereign Bank. That issue was not before the court. So you think that was dicta? I do. And there are numerous cases recognizing that 1643 is a consumer protection statute. There was no consumer involved in Sovereign Bank. Counsel? Yes. Did your client know about this chase card, or did he not know about the chase card? He did not know. At his deposition, he was asked, did you have to give her, meaning is it Ms. Vannick? That's right. Ms. Vannick, some of your contact information so she could make these calls on your behalf to the credit card company's answer. I would assume that she would need to know what the card number was and all of those things like that, and I'm sure I would have given it to her. That's right. So he gave her the number. No, no, no. In that deposition, it's clear that he is referring to other cards that he gave her access to. We, throughout the litigation, have been referring to those as the legitimate cards. She did have access to cards that... How did she get access to the security information for this card? It was a predecessor card. Was it First Bank? And it's still unclear. Due to the lack of documentation provided by Chase, they've never been able to provide us with cardholder agreements, a history of this card. It appears, and it's still disputed, that it may have been a First USA card, and then it turned into a Bank One card, and then a Chase One card. It is unknown how she gained access to this Chase card. Ms. Vannick has taken the fifth. She's now serving time in federal prison. So it's unclear. We surmise that perhaps she stole it out of his desk, and that is referenced in the complaint, but we're just not sure. And also, a possibility may be that she intercepted an unsolicited offer from Chase and opened up the card. We are just not sure. I'd like to pick up on a response you gave to Judge Fisher a moment ago when he asked you about Sovereign Bank. Sovereign Bank concluded specifically that 1643 does not address, nor is it even concerned with, the liability of an issuer or any party other than the cardholder for unauthorized charges. Wasn't it necessary for Sovereign Bank to reach that conclusion, to interpret 1643, in order to dispose of the equitable indemnification claim? I don't believe it was. If you look at that case, there were two plaintiffs in that case. There was Sovereign Bank. There was also PSECU. If you look at the language, PSECU went through the compliance program and was able to obtain reimbursement for the monies that it had to pay back to its account holders. It's unclear for the opinion. I've looked for it. I don't know why Sovereign Bank did not take that same route. It seems that Sovereign Bank had a recourse and did not take it. PSECU did. Maybe Mr. Martin has a different view. Perhaps I should have said at the beginning, if I could reserve three minutes for a rebuttal, that would be appreciated. Your client's position is that they didn't know about the credit card. That's right. But certainly, Mr. Azor knew about the dollar bank checking account. Did he know it? He did. Okay. And as I understand the facts, over all of these, over this seven-year period, payments were made on the credit card from the dollar bank account. Now, if somebody did that out of my account, I would know it pretty quickly. Not just from watching it, but the bank would be calling me. So certainly, he had some knowledge. Well, and I'm glad you asked that question. The district court entered some re-judgment in favor of Chase, finding that Ms. Vanek had apparent authority. And one of the things that they pointed to was the use of the bank. However, it's our position that that's an issue that the jury needs to decide. Everyone's situation is different. And although if someone unbezeled that amount of money out of my checking account and, quite frankly, they could not have, I certainly would have noticed it. However, in his set of circumstances, he didn't notice it. Is that reasonable? Is that not reasonable? It's our position that's for a jury to decide. Yeah, but you said you certainly would know about it. Why can't we say the same thing about Mr. Azor? Because his circumstances are different. You have to take the plaintiff's— Well, because he had a personal assistant who he entrusted to do all of these things for him. But that doesn't mean that you can ignore your own personal account from which over a million dollars was used to pay off a credit card. You say you would know about that. Isn't that the reason why banks send statements to the cardholders? This is your statement. If you have a problem with it, let us know. We have to draw a distinction between the bank and the card issuer. And here we have to look at the perspective of Chase. It now wants to say that it was relying on the apparent authority of an agent. That's a good point because what I'm wondering is where do you really place responsibility? Do you place responsibility on the cardholder to look and inspect the statements when they come in each month, or is it on someone else? Now, what statements are we talking about, Your Honor? The credit card statements or the bank statements? Well, I could say both, but I'll say the bank statement because that's his bank statement. Sure. And he did not notice the money coming out of his bank statements. Now, you're talking about a million dollars in a space of, what, six years, seven years? A little over six years. But there are fairly consistent payments made on a regular basis. And you say he did not know. He did not know. And certainly the federal authorities that investigated this came to that conclusion. There are cases that say that negligence, including omissions and failure to attend to one's banking records, may constitute responsibility. Sure. But you have to look at the circumstances, and is it unreasonable under circumstances? Also, from Chase's perspective. What you're saying is there were charges on his checking account for between $100,000 and $200,000 a month. Is that right? No. I'm sorry, six or seven years, so $100,000 to $200,000 a year that he didn't notice, correct? That's correct. There was a little less. And you're saying with a question of apparent authority, the bank had 65 separate payments, totaling a million dollars without complaint, and you're saying there can't be a conclusion as a matter of law that this woman had apparent authority? That's certainly our— Can there ever be a conclusion as a matter of law that someone has apparent authority? It's very rare, and certainly not under these circumstances. For us, we think it's clear error to allow Chase to rely on apparent authority when they also are saying they didn't know an agent existed. Here, those are completely antithetical arguments that the district court accepted. We think it is, as a matter of law, if Chase is claiming they didn't know anyone other than the cardholder or didn't believe that anyone other than the primary cardholder was using the card, they can't simultaneously claim we thought there was apparent authority. The two arguments break down. We'll get you back on route. But let me ask you one quick question, though. She was making payments out of his personal bank account, and she was doing it by way of writing checks? Also electronic transfers. How do you make an electronic transfer from a personal account? I mean, you have a password, right? No, in her situation, she literally cut and pasted his signature onto a letter and then faxed the letter of authorization into the bank. That's what you mean by electronic? Yes, and then she requested the electronic transfer, and the bank facilitated that transfer. Okay. Ms. Ryan, thank you very much. We'll get you back. Mr. Martin. Mr. Martin. Thank you, Your Honors. James Martin for Appellee Chase. Let me start with Section 1643, if I could. And as far as the Asher case is concerned, I'm not aware of that case. It wasn't cited in the briefing, but I'm not sure that it matters. I'll put myself respectfully in the position of disagreeing with the Seventh Circuit in terms of their analysis of this statute and the idea that it could create an affirmative right of action in a cardholder, notwithstanding the language that refers to the $50 or to the statute of limitations. All of that language is in the statute, certainly for a reason, but it doesn't mean that it has to create a right to reimbursement in a cardholder. The $50 threshold relates to the disputed amounts, and the statute of limitations relates to causes of action that go to the disputed amounts. So the statute as an intrinsic whole makes perfect sense. As the Court suggested, Section 1643 only limits the cardholder's liability. Its text is clear, and it gives the cardholders the right, when they see what they believe is an unauthorized charge in excess of $50 on their account, not to pay it. And that's a real remedy, and it's a meaningful one. And cardholders – Supposing, Mr. Martin, we disagreed with you. We agreed with you with regard to 1643 not establishing a cause of action. But what if we disagree with you with regard to apparent authority? Well, on the issue of – let me come back to that. You disagree with us on 1643. No, I agree with you. 1643 does not provide a private cause of action. Okay. The issue of apparent authority would be irrelevant to the reimbursement action in that situation because the reimbursement for the charges, she couldn't pursue that. On the 1666 claim, the billing error claim, apparent authority would still be relevant if apparent authority is not present. What's the amount in controversy with regard to the 1666 billing error issue? From our perspective, it's the last two statements within the 60-day threshold potentially triggered by either the April 7 letter or the April 20 letter, which would be February and March, and that would be the limit of the controversy. Now, we disagree that that's – How much is that? I don't know. About $20,000? It is in that range. Why wasn't there apparent authority? You never actually spoke to the cardholder. The cardholder says, I never authorized my personal assistant to withdraw any monies from this account. In fact, this was a credit card under her own name. Actually, first of all, in terms of the direct speaking with Chase. No, I'll take that back. It was under his name, wasn't it? Right, yeah, right. The direct speaking with Chase is a slight misdirection of the apparent authority inquiry. TILA is careful to have three pieces of authorization in it, express, implied, and apparent. So TILA itself recognizes that there's a distinction related to apparent authority from express authority or authorization from a cardholder or implied authority. And apparent authority, by definition, focuses beyond expression and written direction and goes to any acts or conduct that put the agent in the position of possessing the authority. And so you don't need to go to what Chase might have said to the cardholder. And, in fact, in the cases that we rely on, Your Honor, the DBI case, the Minskoff case, and the Carrier case, you won't find any communications between the card issuer and the cardholder. All of it was set up by the fraudster, and that's the point. Is your argument that there was apparent authority based on what Ms. Vanik did or what Mr. Azor did or did not do? It was based on what Mr. Azor did and did not do and the reasonableness of Chase's perception in response to that. What did he do? What affirmative act did he do? Well, when we're looking at the proper inquiry, which is, did he put Ms. Vanik in position to defraud the company, that is the apparent authority analysis that the cases engage in and the law requires, we have lots of acts of Mr. Azor. First of all, Mr. Azor, not Ms. Vanik, created her broad role as a personal assistant. Mr. Azor, not Ms. Vanik, centralized the mailing of the statements to the P.O. box. Mr. Azor authorized Ms. Vanik to get and review the mail. He never went to the P.O. box. Mr. Azor allowed Ms. Vanik to present the bills to him for signature. Mr. Azor enabled Ms. Vanik and directed her to handle everything in connection with his bank statements. Mr. Azor directed Ms. Vanik to handle all tasks related to the credit card statements. Mr. Azor authorized Ms. Vanik to deal with the credit card companies. And Mr. Azor put in place a system that had her unmonitored and unsupervised. And that conduct is direct corollary to the conduct that gave rise to apparent authority in the three cases, in the three lead cases. It's putting the fraudster in the position to deal with the company directly and enabling the fraud to occur. That's the first piece of the inquiry. Now, this ---- Roberts. Never actually dealt with Mr. Azor directly, did it? Carvin. And that didn't happen in any of those other cases. And that's the point. That's the basic distinction with apparent authority. Apparent authority is in the TILA statute to shift the burden to the cardholder in these circumstances to explain ---- And he says, no, I never gave her authority to withdraw all of those funds from the chase card. Yes. And to pay out of my personal account. But, Your Honor, he put her in the position to do it. And in that circumstance, he cannot claim lack of knowledge. That is what the concept of apparent authority is about. Because what you then turn around ---- No. But he could have done something about it. Put yourself now in the second half of the inquiry in Chase's position. What happens with Chase is, for 65 statements over seven years, they are paid without dispute from the cardholder's checking account. They make some inquiries. They get identifying information about the card. And the account activity is validated. And nothing is amiss. Do you have anything at all from Mr. Azar that would suggest that Ms. Vanik had authority to use his credit card? No. What we have from Mr. Azar is him putting Ms. Vanik in position to do that. And that's the essential difference regarding apparent authority. And I want to make this point again. Apparent authority to do what? Apparent authority to, from Chase's perspective, to act with respect to the account. That either creates apparent authority on her behalf to make the charges and do what she did, or it creates an estoppel for Mr. Azar to claim that he lacked the knowledge because he failed to investigate over this entire time period. He disagrees with your view. Why isn't it a question of fact for a jury? Because in these circumstances, there is no dispute about the conduct that Mr. Azar engaged in that gives rise to the estoppel prong of it. And there's no dispute about the reasonableness of Chase's response, given seven years of repeated payments with no dispute from his own bank accounts. And let me come back to TILA again on the burden here. The reason apparent authority is in TILA, and it doesn't just confine itself to express or implied authority, is to put the burden on the cardholder in these circumstances when the fraud is occurring to explain how they let it happen. Because from the perspective of the issuer, everything looks copacetic, if you will. He doesn't even know he has this card. But he does have the ability to do something about it. And the burden here, Your Honor, was minimal. Well, he did when he found out. He did, but the reason that he didn't find out is he incapacitated himself from doing it. And that's the key to it. How is the burden minimal? If he didn't know this card exists. The burden is minimal, Your Honor, because all he had to do was provide some oversight of Ms. Vanek in her review of the credit card statements. Well, he didn't know there was a card. I assume he then didn't know there was a statement. Well, but she is handling his personal affairs. Doesn't it all go back to the dollar bank account? It can go to the dollar bank account. That's the next step. All he had to do was thumb through one month's worth of statements. He says, I didn't have a chase card. Or all he had to do, minimally, was put somebody in who monitored or audited. The dollar bank account, that's the account from which these chase cards were paid? Yes. And there were paper payments? You put a check in an envelope with a statement? Some of them, yes. And he signed those checks? His signature is on those checks, and the testimony is clear that even the bank couldn't tell it wasn't his signature. Now, they say they were forgeries, but from Chase's perspective, again, all the account activity looked regular. Does the record show how much activity there was in that dollar bank account in proportion to the amount on a monthly basis that went to pay this chase card? In other words, what percentage of the activity went to pay the chase card each month? I don't know. If the record shows. I don't know what the record shows, and as I stand here, Your Honor, I don't know the answer to that. But the important thing there, of course, is that from Chase's perspective, you had seven years of undisputed payments from the cardholder on the account. And second, of course, that account was something that he could easily have read and reviewed or authorized somebody to do it. Is there evidence in the record that he got monthly statements from dollar banks? There is evidence in the record, in fact, that he occasionally reviewed his bank statements, but only intermittently, again, at his own election. Why? Because he trusted Ms. Vanek to do it. And I would add again that the apparent authority inquiry. Do statements have, like many banks, photocopies of the checks? They do. And so had he looked at these, he could have seen a photocopy of a check to Chase for, on average, what, $20,000 a month, $10,000 a month, something like that? Wherever it came from, either the transfers or the checks, yes. In other words, he had access to that information and he could have detected it. Your Honors, I want to press the point that this is, in light of the DBI, the Carrier, and the Minskoff cases, there are no material, factual differences between this case and those, all of which were just ---- Tell me about the name on the credit card. Excuse me? How about the name on the credit card? Isn't there a difference there? Well, the credit card here was a continuation of his ---- But it wasn't his name. Yes, but those ---- And in the other cases, the credit cards were in the name of the person who was misusing the credit card. They were both. And actually, I think, Your Honor, that makes our case that much stronger. In the case where the secondary user puts themselves on the card, again, without authorization from the principal, it's even less transparent to the ---- I mean, it's even easier, excuse me, for the cardholder to detect that if they're paying attention. What are they doing on that card? Here, the first USA card morphed into the Chase card, all without any cancellation or problem on Chase's end. Payments continued, and the activity was regular. There was no opening of a secondary card or anything else. It was completely the same linear line and transparent to us. Is it your view, I just want to understand your position, that 1643 is ---- permits the concept of apparent authority to bind someone simply because that person put an individual in a position where that individual can misuse a credit card? Yes, when that is combined with the payment stream that we have here and the validation of the account when the contacts are made and the whole totality of the circumstances. But absolutely, that's ---- None of the contacts were made with Mr. Azar, I gather. And the law of apparent authority would not require that. This Mr. Azar has to bear the burden of what he allowed Ms. Vanek to do. That's his conduct that's important to an apparent authority inquiry. If Mr. Vanek, I mean, if Mr. Azar had simply called Chase and said, it's not authorized, that would stop it. If he says it was authorized, we wouldn't have a dispute. So we're moving beyond any oral considerations. And again, in DBI, in Minskoff, and in Carrier, you won't find those communications between the card issuer and the cardholder. This whole thing is plugged into the middle of that and that's the gap that apparent authority is intended to fill so that my client doesn't face the liability later for these millions of dollars worth of charges. Red light is on, Mr. Martin. Thank you very much. Ms. Ryan, three minutes rebuttal. Your Honor, if I could touch on a few points. Opposing counsel made the argument that Chase, or excuse me, that Mr. Azar centralized the mailings. He did not centralize any mailings with regard to the Chase account. As you pointed out, he didn't even know that account existed. In Minskoff, DBI, and Carrier, not only did the primary cardholders know the card existed and were making charges on the card, therefore, they would be expecting the statements. As you pointed out, the agent was listed as a secondary user. Therefore, it was reasonable for the card issuer to make, at least try to make the argument of apparent authority because they knew they were dealing with an agent. Here, Chase is trying to argue we didn't know someone else was using the card, but it's reasonable for us to believe that she had apparent authority. As you're aware, the agent's actions cannot create apparent authority, and that is all that Chase knew about, the agent's actions, not Mr. Azar's. Is there a reason? Ms. Ryan, it seems to me that, you know, you have a tough hurdle in 1643 because of Sovereign Bank, but you do have a negligence claim here, and there hasn't been any discussion at all about the economic loss rule. That's right. And as we briefed, and I know my time is limited, we believe this is the type of claim that the Pennsylvania Supreme Court would let survive. Obviously, the economic loss doctrine serves a purpose, and normally that is to prevent unknown plaintiffs down the economic chain from suing. It arose out of Aiken, which was a negligent interference with contract claim. You have factory workers suing a company because of a railroad derailment. Obviously, that's unforeseen. It was not justifiable. Public policy mitigates against that type of claim going forward. You have a contract claim, and you would be explicitly barred from a negligence claim. We do not have a contract claim. Wait a minute. Isn't a credit card with a bank based on a contractual relationship? It normally would be. Chase has been unable to produce any agreement, and it has always been Mr. Azar's position that he never had an agreement with Chase. But there was still a contract. Not with Mr. Azar. Well, of course there was a contract. It didn't have to be a written contract, but there was still a contract. In order for an implied contract, it has to be ratified by the parties. Mr. Azar never did anything to ratify a contract with Chase and has always been his position, I have no contract with you. And if we find that there is a contract, then how can you have a negligence claim at the same time? That would be a different situation, but those are not the facts here. And Chase has never argued that it had a contract with Mr. Azar. So we believe this is the type of case that the Supreme Court would let go forward under the rationale elicited in Beltright, as well as the most recent case, Excavation Technologies. All the rationale and the Supreme Court in Beltright cited with approval language from the South Carolina Supreme Court that said where there is a tort and there is a duty implied by law, and all the elements are met, it would be nonsensical not to allow the plaintiff to pursue that claim. This is such a situation. Thank you very much. The case is very well presented. We'll take the matter under advisement. Thank you, Your Honor. Thank you both.